UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION (Covington)

*ELECTRONICALLY FILED*

BOONE CNTY. REPUBLICAN PARTY EXECUTIVE COMM., ET AL.    PLAINTIFFS

v.   CIVIL ACTION NO. 3:34-cv-49-GFVT

H. DAVID WALLACE, ET AL.   DEFENDANTS

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION,
PERMANENT INJUNCTION, AND MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Defendants H. David Wallace, Laura Marie Bennett, Jessica Burke, Richard Larkin, Adrian Mendiondo, Thomas O'Brien, and J. Bissell Roberts, board members of the Kentucky Registry of Election Finance ("Registry"), and John Steffen, Registry executive director, all named in their official capacities, respectfully move this Honorable Court to deny the Motion for a Preliminary Injunction, Permanent Injunction, and Summary Judgment ("Motion") [DN 6][1] filed with the Complaint [DN 1] in this matter by Plaintiffs Boone County Republican Executive

---

[1] In the same pleading, the Plaintiffs also requested a temporary restraining order, which this Court denied on July 24, 2024 [DN 10]. A permanent injunction, the standards for which would be the same as for a preliminary injunction, with the notable exception that in the preliminary injunction, the plaintiffs must show a *likelihood* of success on the merits of the case, whereas the question of whether a permanent injunction is appropriate follows *actual* success on the merits. *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010). To the extent that the preliminary injunction would be inappropriate, permanent injunctive relief would be as well.

Committee ("BCREC"), Hardin County Republican Executive Committee ("HCREC"), and Jessamine County Republican Executive Committee ("JCREC").

Without question the First Amendment right to free speech protects the rights of candidates and contributors to disseminate their political message free from excessive government intrusion. The United States Supreme Court, however, has recognized that not all campaign finance laws raise the same level of constitutional concern. Plaintiffs attempt to cast this case in terms of "spending restriction," akin to the outright prohibition on corporations making "electioneering communications" that was overturned in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). The Registry argues below that this is the wrong analysis altogether and that the law it is trying to enforce is not a restriction on the content of speech or the identity of speaker but instead is one which promotes disclosure of election information in a manner calculated to be useful to the electorate. As such it represents a narrowly tailored law that furthers a compelling government interest and meets the "exacting scrutiny" which the *Citizens United* Court required.

## II.     STATEMENT OF FACTS

Since 1992, the Kentucky legislature has defined a "political issues committee" as "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)[.]" Ky. Rev. Stat. Ann. ("KRS") §121.015(3)(d). A political issues committee, because it spends in conjunction with a regular (commonly referred to as "general") election, reports in the same way a candidate reports. The committee indicates whether it intends to raise or spend $5,000 or more in the election within five days of receiving contributions or making expenditures. KRS §121.180(1)(a)1. If it intends to receive or spend

2

less than that amount, it reports only on a 30-day post-election statement of contributions and expenditures.  KRS §121.180(4).  If it does not claim the reporting exemption and raises and spends less than $5,000, it makes reports 60 days, 30 days, and 15 days prior to the election, along with the 30-day post-election statement.

Political issues are not subject to the sort of *quid pro quo* corruption one might fear with candidates. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 352 n. 15, (1995).  Thus, political issues committees cannot be subject to the same sorts of restrictions as committees formed to support candidates.  They do not have the same limits on contributions and can accept corporate contributions.[2]  This will be addressed further below, but to the extent that three or more of their individual members of the Plaintiffs' executive committees have already pooled money to support an issue on the ballot, those individuals are already, under Kentucky law, acting as a political issues committee.[3]

Executive committees, on the other hand, are not defined in the statute, but by each party's bylaws.  They act as the functional unit of the party at county (in this matter) level. For Kentucky campaign finance law purposes, they report on a schedule that has little to do with the election schedule.  It is presumed that they spend for party nominees and, starting this year, many smaller executive committees file only once a year.  KRS §121.180(2)(c) (Executive committees shall report on a "semiannual basis if the committee has more than ten thousand dollars ($10,000) in its campaign fund account. . . .If the committee has less than ten thousand dollars ($10,000) in the campaign fund account, the report. . . .shall be made on an annual

---

[2] KRS 121.150(18) excepts political issues committees from the list of entities not allowed to receive contributions from a corporation.
[3] As the Plaintiffs acknowledge in the Complaint, p. 16, executive committees are made up of individuals.  Further, executive committees are not corporations.  If they were, they could not contribute to campaigns under KRS §§ 121.025, 121.035, 121.150 and Ky. Const. §150.

basis[.]")  When executive committees make contributions, either monetary or in-kind, to a candidate, the candidate reports the contributions on the same schedule outlined for political issues committees above. KRS §121.180(3). To the extent that executive committees make independent expenditures for candidates, the timeline to report those in Kentucky is even shorter. They must be reported as soon as the expenditures exceed $500 in one election (KRS §121.150(1)) and then no later than 48 hours from "the date the communication is publicly distributed" (KRS §121.120(6)(j).)  It is under this system of reporting[4] that the Registry opined that executive committees are not able to make expenditures to support or oppose ballot issues.

Plaintiffs are three county-level Republican Party executive committees, those in Boone, Hardin, and Jessamine counties.  Of those three, two availed themselves on June 7, 2024, of the Registry's advisory opinion process set out in KRS § 121.135(1), which states:

> Any person may file a written request with the registry for an advisory opinion concerning the application of the provisions of this chapter or any administrative regulation promulgated by the registry with respect to a specific transaction or activity by the person. The registry shall render a written advisory opinion relating to the specific transaction or activity to the person making the request not later than thirty (30) days after the registry receives the request.

As recounted in Advisory Opinion 2024-02 ("AO 2024-02") and attached to the Plaintiff's Complaint as Exhibit B, both HCREC and JCREC asked two questions through letters signed by their chairs (Bobbie Coleman for HCREC and Kim Garrison for JCREC) in nearly identical verbiage:

1) May county executive committees make expenditures in support of or against constitutional ballot issues; and

---

[4] Plaintiffs do not challenge the requirements that executive committees must report contributions and expenditures.  Complaint, p. 12, para. 46.

4

    2) If an executive committee may make such expenditures in support or against constitutional ballot issues, what expenditures are allowed and what are prohibited?

HCREC asked a third question, whether the purchasing of signs and advertising would be an activity that the Registry believed was subject to its regulation, a question and answer which the Plaintiffs do not address further in their Complaint.

    The Registry's General Counsel, the undersigned, answered all three questions on July 8, 2024, stating that "executive committee" was not a type of committee defined in KRS §121.015, the general definitional section of Kentucky's campaign finance statutes, but they were defined in 32 Ky. Admin. Reg. ("KAR") 1:050, the administrative regulation that describes how political organizations required to make campaign finance-related filings under Kentucky law must do so. That definition states that an executive committee is:

> . . . an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office.

Nothing in that definition referenced, nor did the rules of the Republican Party of Kentucky discuss, an executive committee spending to advocate for or against ballot issues, thus, the Advisory Opinion stated that, under Kentucky law, executive committees could not use funds they would otherwise use to raise and spend to support the party's nominees.  It noted, however, that individual members could join together and form political issues committees, as described above, under KRS §121.015(d).

    While the Plaintiffs categorize the AO 2024-02 as the state's "threat of enforcement," in its Complaint, advisory opinions do not reflect the Registry's intent to begin enforcement action. The Registry, under KRS §121.135, issues advisory opinions only when requested and makes

5

them public. However, the statutory and regulatory scheme make clear that advisory opinions are of limited value, which accrues only to the requester. First, the opinion must describe a "specific transaction or activity by" the requester. KRS §121.135(1). Once an opinion is rendered, it relates only to the person making the request. *Id.* Under the corresponding administrative regulation, 32 KAR 2:060, the request must:

- Disclose the identity of the requester (Subsection 1(1));

- Describe a transaction the requester intends to undertake or is presently taking (Subsection 1(2)(a));[5]

- Not present a general question of interpretation, pose a hypothetical situation, or regard actions of a third party (Subsection 1(2)(b)); and

- Contain a complete description of all relevant facts (Subsection 1(3)).

If the requester meets all of these criteria, KRS §121.135(4)(b) states that:

> [A]ny person or committee to whom a written advisory opinion has been rendered who relies upon any provision or finding of the advisory opinion and who acts in good faith in accordance with the provisions and findings of the advisory opinion shall not, as a result of any act with respect to a transaction or activity addressed by the advisory opinion, be subject to any sanction provided by this chapter or any administrative regulation promulgated by the registry.

The statute also makes clear that:

> It shall be no defense in any civil or criminal proceeding regarding a violation of any provision of this chapter or any administrative regulation promulgated by the registry for a person or committee to claim that he relied upon and acted in good faith based upon any provision or finding of an advisory opinion if the person or

---

[5] Plaintiffs have asked for this case to move in an expedited manner, because they anticipate beginning door-to-door campaigning on August 24, 2024. Thus, they ask for relief by August 21, 2024, to have time to print material similar to that provided in the Complaint. It is worth noting here that the time crunch has been created by HCREC and JCREC waiting until June to request an advisory opinion that they could have requested at any time after the bill was delivered to the Secretary of State on March 21, 2024, when it became clear there would be a ballot issue to support.

>committee was not the person or committee involved in the specific transaction or activity with respect to which the advisory opinion was rendered.

In this instance, HCREC and JCREC requested opinions based on the same, quite limited, fact pattern. The committees stated nothing more than, in JCREC's case:

>We want to promote and support the passing of Amendment 2 on School Choice that will be on the ballot this November. We anticipate spending money on texts, signs, and other advertising/promotional materials. There are many other groups, such as teachers' unions, promoting their thoughts on the issue.

HCREC's request stated that the committee "wants to spend money on signs and other advertisements in favor of the school choice amendment that will be on the Kentucky ballot November 5, 2024."[6] BCREC did not make a request, nor was it even mentioned in the other requests. Neither were "joint expenditures" as described in the Plaintiffs' Complaint or the layout of a potential mailer itself, as attached to the Complaint as Exhibit A. At the time the requests were made, they were posted, as required by statute, for ten days, for public comment. The Registry received no comments, not even from BCREC.

As evidenced in the Complaint's Exhibit C, what happened immediately after the release of the AO 2024-02, on July 16, 2024, is that Counsel for the Plaintiffs contacted the Registry to threaten action in federal court if the Registry did not withdraw it. However, at that time, counsel said he represented HCREC and BCREC. Counsel for the Registry attempted to explain that the AO 2024-02 took no action of itself, but acted only as a defense to an action. Further, BCREC would not be able to avail itself of that defense, no matter what the opinion had said, as it had not been a requester. The Registry noted that any individuals who wish to support the amendment could form a political issues committee, call it anything they like, up to and

---

[6] See Exhibit A to this Response for copies of the Requests, which are also available at on the Registry's website at https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Requests.pdf.

7

including "Hardin County Republicans – Vote 'Yes' for School Choice" and stay within the law. Further, the Registry noted that, as discussed above, it did not see the committees as a distinction without a difference because the reporting schedules are so different.

On July 17, 2024, Mr. Wiest emailed the following:

> A separate issues committee does not solve the problem. The intention is to run electioneering communications that jointly advocate for both the Republican ticket (up and down the ballot) as well as the constitutional amendment, including voter education that a straight ticket vote does not vote the amendment. Said another way, the intention is to run mail and door-to-door pieces that advocate for both the Republican ticket and the constitutional amendment, on the same mail and door-to-door pieces.

Here, for the first time, the Registry was advised that some executive committees were interested in spending on advertising that looked something like the advertising provided with the Complaint, which represented a different question entirely, and was not covered by the AO 2024-02. This is clear in the Registry's emailed response, which agrees that county parties have a long history of voter education and that educating voters on how straight ticket voting works would be part of the executive committees' job in the counties. The Registry noted, which would be true in no matter what the outcome of the AO 2024-02 that it cannot refuse to process a complaint properly filed under KRS 121.140. Advisory opinions, once again only act as a defense to enforcement action. In Response to the Registry's email on Thursday, July 18, 2024, the Plaintiffs filed this matter on Monday, July 22, 2024. Plaintiffs simultaneously with their Complaint, filed motions for a temporary restraining order, preliminary injunction, permanent injunction, and summary judgment.[7] However, Plaintiffs' motions for injunctive relief and

---

[7] This Court denied the Motion for Temporary Restraining Order on July 24, 2024, finding that the Plaintiffs had not alleged and the Court found unlikely, that the Registry would review the Plaintiffs' use of campaign funds inside of 14 days, nor would a TRO keep the Registry from seeking enforcement following the end of that period. The Court acknowledged at that time that "violation of one's constitutional rights is an irreparable harm," but that any potential harm was

summary judgment should be denied as the Plaintiffs can meet none of the four factors used to determine whether injunctive relief is appropriate, nor do the Defendants agree with the facts as the Plaintiffs present them.

IV.     **THE COURT SHOULD DENY INJUNCTIVE RELIEF IN THIS MATTER.**

    A.     **Standard**

The Court considers four factors in determining whether to grant a preliminary injunction motion:

    (1)     the likelihood of plaintiff's success on the merits;

    (2)     whether the injunction will save plaintiff from irreparable injury;

    (3)     whether the injunction would harm others; and

    (4)     whether the public interest would be served.

*International Longshoremen's Association v. Norfolk Southern Corp.,* 927 F.2d 900, 903 (6th Cir. 1991). The Court must make specific findings concerning each of the four factors, unless fewer are dispositive of the issue. *Id*., see also *In re DeLorean Motor Co*., 755 F.2d 1223, 1228 (6th Cir. 1985). The Plaintiffs should prevail on none of these factors.

    B.     **The Plaintiff Does Not Have a Likelihood for Success On the Merits.**

In the Motion, Plaintiffs quote *Jones v. Caruso*, 569 F.3d 258, 265-66 (6th Cir 2009) for the proposition that "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor" and the Registry agrees. Plaintiffs, however, cannot establish that they prevail. The governmental interest in this matter is one of disclosure and providing the electorate with information in a timely matter relative to the election date. This is not a matter subject to

---

not preventable by the Plaintiffs' choice of remedy. The Registry, of course, argues below that there has been no harm or threat of harm because the Plaintiffs' rights had not been violated.

9

strict scrutiny, but one that must meet a standard of exacting scrutiny. Of such matters, the Supreme Court has said:

> Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' *Buckley,* 424 U.S., at 64, 96 S.Ct. 612, and 'do not prevent anyone from speaking,' *McConnell,* [540 U.S. 93] at 201, 124 S.Ct. 619 (internal quotation marks and brackets omitted). The Court has subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest. *Buckley, supra,* at 64, 66, 96 S.Ct. 612 (internal quotation marks omitted); see *McConnell, supra,* at 231–232, 124 S.Ct. 619.
>
> In *Buckley,* the Court explained that disclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending. *Buckley, supra.* at 66, 96 S.Ct. 612.

*Citizens United at* 366–67.

The disclosure interest here is specific. Instead of contributions and expenditures relating to a ballot issue being reported once (or potentially twice) a year, and in no relation to the election, the contributions and expenditures are reported on a schedule related to the election, in the same way candidates are reported. The Registry has no interest in the identity of speakers or the message here, only the transparency of campaign finance. The only "content restriction" is a determination of whether an issue is on the ballot (thus, subjecting committees supporting or opposing it to registration as a "political issues committee" under KRS §121.015(3)(d) and 32 KAR 1:050) or not. Further, the Registry's interpretation of the law in this manner is not a spending restriction. In reality, registering as a political issues committee alleviates restrictions to which executive committees are subjected, such as the prohibition on corporate contributions in KRS §121.035 and the $5,000 per year contributor limit in KRS §121.150(11)(a)&(b).

All of the above makes the Plaintiff's reliance on *Eu v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214 (1989) for its Freedom of Association Claim curious. It cites the case for the proposition "[e]ven though individual members of the state central committees and

county central committees are free to issue endorsements, imposing limitations on 'individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." *Id*. at 224-225.  Here the Registry wants to treat the party's membership *exactly* as it would individuals banding together to advance views on a ballot measure.

This is not the case that the Supreme Court faced in *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986), in which a non-profit corporation wished to publish a newsletter urging readers to vote for "pro-life" candidates and the Federal Election Campaign Act and the FEC wanted it to establish a "separate segregated fund" (which the court likened to a political committee).  There the court said that the "state interest in disclosure [] can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act." *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 262, 107 S. Ct. 616, 630, 93 L. Ed. 2d 539 (1986).  Kentucky requires no independent expenditure reporting for advertising advocating for or against ballot issues.  The only meaningful reporting of expenditures for ballot issues comes through the registration as a political issues committee. The government's disclosure interest in providing this information to the public near in time to the election is both "sufficiently important" and "bears a substantial relation" to the requirement in order to survive "exacting scrutiny." *See Citizens United* at 366-367.

### C. The Plaintiffs Have Suffered No Irreparable Injury

In this case, the most concrete harm the Plaintiffs have alleged is that HCREC and JCREC do not have access to a defense, by virtue of a favorable KRS 121.135 advisory opinion, against a potential complaint that no third party has made or an enforcement action that the

Registry has not threatened. BCREC, having not been one of the requesters of 2024-002, stands in no different position than it did had the Registry never issued the 2024-002 in the first place. Given that the Registry was not provided with the full facts of the "specific transaction or activity" that the Plaintiffs wished to conduct, the Defendants would argue that, without conceding the issue of whether executive committees can spend on political issues, AO 2024-02 currently does not apply to the situation in which the Plaintiffs wish to engage. As evidenced by the Registry's email exchange with Plaintiffs' counsel, had HCREC and JCREC more fully explained the nature of these "Joint Expenditures," which the Plaintiffs still have not fully clarified, the resulting advisory opinion would not have looked the same.

Plaintiffs have attempted to categorize 2024-02 as a "warning letter," such as the letter issued by the Ohio State Dental Board in *Kiser v. Reitz, 765 F. 3d 601 (6th Cir. 2014)*, in which the board issued a letter to a regulated dentist stating that it had recently concluded an investigation into a particular patient's treatment, and "concerns [had] arisen" regarding the scope of his practice and his advertising of it. *Id.* at 605. In that case, the 6th Circuit noted that the Supreme Court in *Texas v. United States*, 523 U.S. 296 (1998) that a court should not adjudicate a claim "if it rests on contingent future events that may not occur as anticipated, or indeed may not occur at all." (Internal citations omitted.) The 6th Circuit continued:

> A plaintiff satisfies this requirement when he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). When a plaintiff has engaged in a course of conduct and the state has instructed him to stop or face disciplinary action, we may infer a threat of prosecution that is neither 'chimerical,' *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (internal quotation marks omitted), nor 'imaginary or wholly speculative,' *Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301. Under such circumstances, a plaintiff has adequately alleged a concrete and imminent harm sufficient to meet the 'injury in fact' requirement.

12

*Kiser* at 608.

Because of this, it found that Kiser had suffered harm that resulted from the Board's particularized threatened enforcement against him, the result of an investigation. Such is not the case in the matter currently before the Court. Here, two of the Plaintiffs requested an opinion, which the Registry gave as required by statute. The Registry has engaged in no enforcement action against those two Plaintiffs (nor indicated it intended one) and has said nothing of the third at all, except that it did not view the advisory opinion as being relevant to it.

Further, the Registry is without the ability to prevent prosecution should another agency charged with upholding criminal election laws decide to pursue action. Plaintiffs claim to suffer irreparable harm because they could face criminal penalties as a result of AO 2024-02. However, Plaintiffs cannot reasonably base their claims of irreparable harm on the fear that the Registry, through the Defendants, will criminally prosecute them. Kentucky's Attorney General is the chief enforcement officer of criminal violations of Kentucky's campaign finance law. The role of the Registry is civil: to assure the integrity of Kentucky's electoral process by making certain there is full public access to campaign financial data and financial disclosure reports, and by administering Kentucky's campaign finance laws. The Registry's regulatory function includes tracking of candidate and committee election finance activities, audit functions, investigations, review of and response to requests for advisory opinions, and adjudication of administrative charges of violations of campaign finance laws. KRS § 121.005, et seq.

The Registry's jurisdiction is limited to Chapter 121 of the Kentucky Revised Statutes. However, KRS Chapter 121 does not provide the only means by which a campaign finance violation may be initially investigated. *Naegele Outdoor Advertising Co. v. Moulton*, 773 F.2d 692, 694-95 (6th Cir. 1985) cert. denied, 475 U.S. 1121 (1986), see also *Democratic*

*Party of Kentucky v. Graham*, 976 S.W.2d 423, 429-30 (Ky. 1998). KRS § 121.140 expressly contemplates that the Attorney General or appropriate local prosecutor has responsibility for prosecutions of Kentucky's campaign finance law. *Naegele* at 697.

Nor is the Registry able to keep the Plaintiffs from producing any advertising they wish. The only conceivable harm the Plaintiffs face from the Registry would be civil penalties, and for those to accrue all of the following must happen: [8]

- The Registry receives a complaint from an outside party or from staff;

- The Registry General Counsel conducts an investigation into the matter, files a report and makes recommendations;

- The Registry's Board meets and votes that there is probable cause to believe that a violation has occurred that was not made knowingly;

- The Registry's Board refer the matter to the General Counsel and the Executive Director for conciliation proceedings; ***and***

- The Plaintiffs either accept a conciliation agreement or proceed to a formal administrative hearing.

Should the alleged violation survive all of those steps, the Plaintiffs could face a penalty. Even if that were a certainty, they do not face irreparable harm. The Supreme Court has said:

> 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

---

[8] KRS §121.140 and 32 KAR 2:030 -2:050.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974), citing with approval *Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921 (1958). The Plaintiffs have shown no irreparable damage here, thus this factor should be found for the Defendants.

**D.     An Injunction at this Stage Would Harm Others and Fail to Serve the Public Interest.**

The last two factors seem hard to detangle in this matter. The third parties involved in this matter would, of course, be *the public*. In *Citizens United*, the Court said, "Even if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369. Nothing would compel a different result for ballot issues here. If the public has any interest at all in knowing about who is spending on a ballot issue, it would surely be before such an election is held, when the transparency can allow it to "give proper weight to different speakers and messages." *Id.* at 371.

For this ballot issue, the applicable election date is November 5, 2024. Under KRS §121.180, executive committees had a July 31, 2024, reporting deadline and will not report again until January 31, 2025. The way the Plaintiffs timed their advertising and subsequent request for preliminary injunction ensures that the voting public,[9] will not have a chance to see who contributed to the ballot issue ads for Amendment 2, which the Complaint refers to as the "School Choice Amendment," before the election. Note even the post-election report is close in time. That information is lost.

The Motion confuses the issue of what kind of committee the Registry is addressing, calling it an "issues PAC." The Motion needs to use this term to then argue that the Supreme Court called PACs burdensome in *Citizens United*:

---

[9] Or even the curious public.

15

> PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days.

*Id.* at 337–38. For Kentucky purposes, there is no committee known as a "political action committee" or a "PAC" or an "issues PAC." Committees most analogous to federal PACs are known as "permanent committees" in Kentucky and are not at issue here. See KRS 121.015(3)(e). For state purposes, all committees appoint a chairperson and a treasurer, forward contributions to the treasurer, keeps records, preserve them for six years, file organizational statements, and make reports as required.

If the Plaintiffs report as a political issues committee, they will report contributions and expenditures on September 10, October 8, and October 23, 2024, all pre-election. The public will also have the benefit of a December 12, 2024, report. Once again, no additional information is required, nor is any left out across the two reporting schemes. The only question is will the information be of any use to the public when it receives it? These factors weigh against a preliminary injunction for the Plaintiffs.

V.   **THE COURT SHOULD DENY SUMMARY JUDGMENT IN THIS MATTER.**

In addition to their requests for injunctive relief, the Plaintiffs also move for summary judgment. The arguments against the appropriateness of summary judgment on the grounds that the Plaintiffs are not entitled to judgment as a matter of law have already been made in this Response. It will briefly address additional concerns that the motion for summary judgment raises below.

### A.    Standard.

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law Fed. R. Civ. P. 56(a). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B.    Genuine Issues of Material Fact Remain.

There are a number of "Facts Common to All Claims" included in the Complaint that the Defendants have no ability to confirm or deny, as would be required in an Answer, nor have the Plaintiffs provided any proof of them, aside from filing a verified complaint.. Among these are that the School Choice Amendment "is a central issue to voters," that "advocacy in favor of the School Choice Amendment is likely to also substantially assist in electing their nominated candidates," or that "driving voter turnout in support for the School Choice Amendment will result in additional voter turnout for nominated Republican candidates" (all in Para. 17). However, the Registry would disagree with at least one "fact" for which it would have knowledge that extends beyond that of the Plaintiffs.

Each Plaintiff has stated that its committee has raised substantial funds for the purpose of "running Joint Expenditures," with BCREC raising approximately $20,000 and the other two counties raising approximately $10,000 each. As described above, the Registry currently has made no opinion, advisory or otherwise, as to what is allowable for "joint expenditures." It is uncertain what these expenditures are and whether they reflect in-kind contributions to or independent expenditures for candidates, coupled with an expenditure in support of ballot issues.

17

The Plaintiffs have not stated how expenditures are to be divided between the two ballot issues and the candidates or how they intend to report them. AO 2024-02 does not address "joint expenditures," nor were they explained in the request. Thus, the Registry could not, and did not, issue an advisory opinion concerning those "joint expenditures" at all. (See Complaint, Para. 31.) It was unaware that they were planned until it received Plaintiffs' counsel several days later and had not seen an example until the Complaint was filed on July 22, 2024.

## CONCLUSION

Plaintiffs are not entitled to injunctive relief in this case. They have failed to demonstrate a substantial likelihood of prevailing on the merits or that they will suffer irreparable injury. The public's interest is not served by reduced reporting on election spending that occurs only after the election and the voting public is harmed as a result of it. For these reasons, Defendant respectfully requests that the Court deny the Plaintiffs' Motion for Preliminary and Permanent Injunctions. The Defendants also argue that this case is not appropriate for summary judgment and respectfully request the Court to deny the Plaintiffs' motion for it, as well.

Respectfully submitted,

*/s/ Leslie M. Saunders*

Leslie M. Saunders (KBA 89446)
General Counsel
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, Kentucky 40601
LeslieM.Saunders@ky.gov
(502) 573-2226 (phone)
(502) 573-5622 (fax)
*COUNSEL FOR DEFENDANTS*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 9, 2024, I electronically filed the foregoing document with the Court by using the CM/EFC system, which will send a notice of electronic filing to the Hon. Christopher Wiest (email address: chris@cwiestlaw.com), the Hon. Theodore Roberts (tjroberts223@gmail.com), and the Hon. Thomas Bruns (email address: tbruns@bcvalw.com). Further service will be provided to the Kentucky Attorney General, Office of the Attorney General, 700 Capitol Avenue, Suite 118, Frankfort, Kentucky 40601-3449, by copy sent via first class mail, postage pre-paid.

                */s/Leslie M. Saunders*

                Leslie M. Saunders
                *COUNSEL FOR DEFENDANTS*