RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0211p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

BOONE COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE, HARDIN COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE, and JESSAMINE COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE,

*Plaintiffs-Appellants*,

*v.*

H. DAVID WALLACE, LAURA MARIE BENNETT, JESSICA BURKE, RICHARD LARKIN, ADRIAN MENDIONDO, THOMAS O'BRIEN, and J. BISSELL ROBERTS, in their official capacities as board members of the Kentucky Registry of Election Finance; JOHN STEFFEN, in his official capacity as the Executive Director of the Kentucky Registry of Election Finance,

*Defendants-Appellees*.

No. 24-5783

---

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:24-cv-00049—Gregory F. Van Tatenhove, District Judge.

Decided and Filed: September 5, 2024

Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ON MOTION FOR INJUNCTION PENDING APPEAL and REPLY:** Christopher Wiest, Theodore Roberts, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas B. Bruns, BRUNS, CONNELL, VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for Appellants. **ON RESPONSE:** Leslie M. Saunders, KENTUCKY REGISTRY OF ELECTION FIANANCE, Frankfort, Kentucky for Appellees. **ON AMICUS BRIEF:** Matthew F. Kuhn, John H. Heyburn, Elizabeth Hedges, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae.

Case: 3:24-cv-00049-GFVT   Doc #: 29-1   Filed: 09/05/24   Page: 2 of 15 - Page ID#: 303

No. 24-5783            *Boone Cnty. Republican Party et al. v. Wallace et al.*            Page 2

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Three Kentucky Republican Party county executive committees challenge the Kentucky Registry of Election Finance's prohibition on expending funds in support of a state constitutional amendment on the November general-election ballot.  The district court denied the executive committees' application for a preliminary injunction.  The executive committees seek an injunction pending appeal of the preliminary-injunction decision.  Because we conclude that the executive committees are likely to succeed on the merits of their First Amendment claim, we grant the injunction pending appeal and order expedited briefing on the appeal of the denial of the executive committees' motion for preliminary injunction.

**I.**

**A. Statutory and Regulatory Framework**

This case concerns the constitutionality of a part of Kentucky's campaign-finance regime, and the Kentucky Registry of Election Finance's ("the Registry") interpretation and enforcement thereof.  Accordingly, some background is in order.  The Registry is a state agency charged with regulating campaign-finance disclosures and investigating and civilly prosecuting campaign-finance violations.  Ky. Rev. Stat. § 121.120(1).  The Registry may investigate and civilly prosecute state campaign-finance violations "[u]pon the sworn complaint of any person, or on its own initiative."  *Id.* § 121.140(1).  When the Registry has probable cause to believe that state campaign-finance law has been knowingly violated, the Registry shall refer the case to appropriate state or county authorities for criminal prosecution.  *Id.* § 121.140(5).  The Registry also has power to issue advisory opinions, upon request of any person, "concerning the application" of state campaign-finance law or regulations to a specific transaction or activity.  *Id.* § 121.135(1).  An advisory opinion authorizing the transaction or activity described in the request may be relied upon by the requestor as a defense to any future enforcement.  *Id.* § 121.135(4).

The Registry regulates campaign activities in part through a statutory taxonomy of "committees" subject to different requirements. As a general matter, a committee must register with the Registry, "by filing official notice of intention at the time of organization, giving names, addresses, and positions of the officers of the organization, identifying an official contact person of the committee, and designating the candidate or candidates, slate of candidates, or question it is organized to support or oppose on forms prescribed by the registry." Ky. Rev. Stat. § 121.170(1). Committees must designate a campaign treasurer, who must designate a depository bank to hold contributions, maintain records of contributors and contributions, make or authorize expenditures, and maintain records for six years from the final date of filing. *Id.* §§ 121.160(1)–(2), 121.170(3). After making an independent expenditure advocating the election or defeat of a candidate or slate of candidates, committees must report within 48 hours of the communication being distributed or otherwise publicly disseminated. *Id.* § 121.120(6)(j).

One type of committee is a "political issues committee," which is defined as "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)." Ky. Rev. Stat. § 121.015(3)(d). Within five days of meeting the statutory definition of a political issues committee, that committee must submit a form to the Registry indicating whether it intends to raise or spend more than $5,000 in any one election. *Id.* § 121.180(1)(a)(1). Political issues committees may receive unlimited contributions, including contributions from corporations. *Id.* § 121.150(18); *see id.* § 121.150(11). Funds must be expended on the particular issue, such as a constitutional amendment, for which they are raised, and any excess funds following an election must be returned to contributors, escheated to the State Treasury, donated to charity, or spent on future advocacy of the same issue. *Id.* § 121.180(10)(a), (d). Political issues committees that intend to raise or spend more than $5,000 must report in the run-up to the election—60 days, 30 days, and 15 days before the election day. *Id.* § 121.180(3)(b). By contrast, political issues committees intending to raise or spend less than $5,000 must report on their receipts and expenditures only after an election ends (within 30 days of the election). *Id.* § 121.180(4).

No. 24-5783 *Boone Cnty. Republican Party et al. v. Wallace et al.* Page 4

The other type of committee relevant here is an "executive committee of a political party." An executive committee is not defined by statute, but a Kentucky regulation defines it as

> an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office.

32 Ky. Admin. Reg. 1:050, § 1(1). Executive committees may not accept corporate contributions or contributions in excess of $5,000 from any one person. Ky. Rev. Stat. § 121.150(11)(a), (18). On an annual or semiannual basis, executive committees must make a full public report of all money received from any source and all expenditures made. *Id.* § 121.180(2)(a). Such reports must be made on an annual basis for executive committees with less than $10,000 in their campaign account and on a semiannual basis for executive committees with more than $10,000. *Id.* § 121.180(2)(c).

**B. Factual Background**

Appellants in this case are three county Republican Party executive committees—the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP") (collectively "the executive committees"). R.1 (Pls.' Verified Compl. for Decl. & Inj. Relief ("Ver. Compl.") ¶ 4) (Page ID #4). On or about June 10, 2024, HCRP and JCRP sought an advisory opinion from the Registry as to whether a county party executive committee may make expenditures supporting or opposing a state constitutional amendment on the ballot. R. 14-3 (Exhibits to Defs.' Mem. of Law in Resp. to Pls.' Mot. for Prelim. Inj., Permanent Inj., & Mot. for Summ. J.) (Page ID #148–49). In response to their requests, the Registry issued an advisory opinion. R. 1-3 (Exhibit to Ver. Compl.) (Page ID #21–23). In Advisory Opinion 2024-02 the Registry interpreted the regulatory definition of an executive committee, which authorizes such committees to "'raise[] and spend[] funds to promote political party nominees'" and to "'perform[] other activities commensurate with the day-to-day operation of a political party'" to foreclose "us[ing] the funds that it raises for party

nominees to support a constitutional amendment." *Id.* at 2–3 (Page ID #22–23) (quoting 32 Ky. Admin. Reg. 1:050). The Registry opined that "[t]o the extent that members of the executive committee would like to begin raising funds to support or oppose a constitutional amendment, those members interested must form a political issues committee to do so." *Id.* at 3 (Page ID #23).

After this advisory opinion issued, HCRP and JCRP retained counsel who, in a series of emails to the Registry, revealed more precisely how they sought to act. R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24–28). The executive committees wished to print and distribute communications that simultaneously (1) advocate for the Republican slate of candidates, (2) advocate in favor of a constitutional amendment; and (3) provide voter education that a "straight ticket vote does not vote the amendment." *Id.* at 2 (Page ID #25). The executive committees believed that they would be foreclosed, under the Registry's opinion, from producing these communications because they included direct advocacy in favor of a constitutional amendment.

In the exchange with the Registry, the parties' counsel asked the Registry to withdraw its opinion and sought assurances that they would not be subject to enforcement for engaging in such communications. R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24). Counsel for the Registry refused. *Id.* Lacking those assurances, HCRP and JCRP, along with BCRP (which was not involved in the advisory letter exchange), filed a verified complaint for declaratory and injunctive relief against members of the Registry and its executive director ("the Registry"). R. 1 (Ver. Compl.) (Page ID #1). In their verified complaint, the executive committees acknowledged that they had "expressly raised funds and solicited donors for donations, for the express purpose of purchasing signs, campaign materials (to include mailers and door-to-door door hangers) that advocate in favor of the Republican party candidates and nominees (both local and national), as well as the School Choice Amendment." *Id.* ¶ 16 (Page ID #6). The School Choice Amendment, known as Amendment 2, is a Kentucky proposed state constitutional amendment, which would authorize the state legislature to "provide financial support for the education of students outside the system of common schools." *Id.* ¶ 2 (Page ID #3); *see* 2024 Ky. Acts 32 (H.B. 2). According to appellants, Amendment 2 is a "central issue for voters,

No. 24-5783    *Boone Cnty. Republican Party et al. v. Wallace et al.*    Page 6

particularly voters aligned with [the parties'] values." *Id.* ¶ 17 (Page ID #6). Thus, having "determined" that advocacy in favor of the amendment is likely to drive turnout in favor of Republican candidates, the executive committees have designed mailers and door-to-door campaign printings that simultaneously advocate the Republican slate of candidates and the constitutional amendment. *Id.* ¶ 31 (Page ID #9).[1] As of the filing of the complaint, none of the executive committees had yet begun printing or distributing the communications, although the HCRP and BCRP intended to do so regardless of judicial intervention. *Id.* ¶ 36 (Page ID #10).

**C. Procedural Background**

Simultaneous with the filing of their verified complaint in the district court, the executive committees moved for a temporary restraining order, a preliminary injunction, a permanent injunction, and summary judgment. R. 6 (Pls.' Mot. for TRO, Prelim Inj., Permanent Inj., and Summ. J. ("PI Mot.")) (Page ID #65–84). The executive committees contend that the Registry violates their First Amendment rights by prohibiting executive committees from making expenditures in favor of a constitutional amendment. *Id.* at 16 (Page ID #80). The district court denied the TRO on the grounds that the executive committees were unlikely to face enforcement action within the duration of any TRO, but set an expedited briefing schedule on the other motions. R. 9 (TRO Mem. Op. & Order at 4) (Page ID #114); R. 13 (Scheduling Order) (Page ID #121). The Registry opposed the executive committees' motions, arguing that they lacked standing to bring a preenforcement challenge and that the Registry did not limit the executive committees' expenditures, but rather sought only to enforce valid disclosure requirements on independent expenditures by requiring the executive committees to form political issues committees in support of the amendment. R. 14 (Defs.' Mem. of Law in Supp. of Resp. to PI Mot. at 10–11) (Page ID #131–32).

The district court denied the motion for a preliminary injunction after a hearing. Although the district court found that the executive committees had standing to bring their preenforcement challenge, the court concluded that they were unlikely to succeed on the merits of their First Amendment claim. R. 22 (PI Op. & Order at 6–13) (Page ID #213–20). The

---

[1] BCRP also intends to expend funds in support of a separate amendment that would prohibit non-citizens from voting in Kentucky elections. R. 1 (Ver. Compl. ¶ 18) (Page ID #6).

No. 24-5783   *Boone Cnty. Republican Party et al. v. Wallace et al.*   Page 7

district court reasoned that requiring the executive committees to form political issues committees to expend money in favor of the constitutional amendment imposed at most a "minimal" burden on the executive committees' First Amendment rights, which was justified by the governmental interest in transparency and disclosure. *Id.* at 10–13 (Page ID #217–20). Hence, under the standards of strict scrutiny, "exacting" scrutiny, or rational basis review, the Registry met its burden. *Id.* at 13 (Page ID #220).

The executive committees appealed the denial of the preliminary injunction and moved in the district court for an injunction pending appeal. R. 24 (Emergency Mot. for Inj. Pending Appeal) (Page ID #227–31). The district court denied the motion for an injunction pending appeal. R. 26 (D. Ct. Inj. Pending Appeal Mem. Op. & Order) (Page ID #285–94). The executive committees now seek an injunction pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2).[2]

## II.

We usually consider four factors when deciding whether to grant an injunction pending appeal: (1) whether the applicants are likely to succeed on the merits of their appeal; (2) whether the applicants will be irreparably harmed absent the injunction; (3) whether the injunction will injure other parties; and (4) whether the public interest favors an injunction. *A. Philip Randolph Inst. v. Husted*, 907 F.3d 913, 917 (6th Cir. 2018). But in First Amendment cases, the outcome generally boils down to the first factor, whether plaintiffs have shown a likelihood of success on the merits of their First Amendment claim. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) ("The public interest analysis and the question of whether [the plaintiffs] will suffer irreparable injury entirely depend on whether the solicitation policy and its enforcement by [the defendant] are constitutional."). "Because we are not reviewing any district court decision or order, our review is *de novo*." *Husted*, 907 F.3d at 917.

---

[2]In addition to the parties' briefs and the record below, we have also considered the amicus brief filed by the Kentucky Attorney General in support of the executive committees.

Case: 3:24-cv-00049-GFVT Doc #: 29-1 Filed: 09/05/24 Page: 8 of 15 - Page ID#: 309

No. 24-5783  *Boone Cnty. Republican Party et al. v. Wallace et al.*  Page 8

### III.

The party invoking federal jurisdiction bears the burden to establish the elements of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.* On a motion for an injunction pending appeal, plaintiffs must demonstrate a likelihood that they will ultimately be able to establish their standing to sue. *See Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021).

To establish Article III standing, a plaintiff must show an injury in fact caused by the complained of conduct that would be redressable by a favorable decision. *Lujan*, 504 U.S. at 560–61. An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation omitted). An allegation of future injury may suffice when the threatened injury is "certainly impending" or there is a "substantial risk" that harm will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013). Accordingly, when an arrest, prosecution, or other enforcement action is sufficiently imminent, the injury-in-fact element is satisfied. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* (quoting *Steffel v. Thompson,* 415 U.S. 452, 459 (1974)).

At this stage, the executive committees can establish the requisite injury to bring a pre-enforcement challenge by demonstrating a likelihood that (1) they intend to engage in expression protected by the Free Speech and Association Clauses; (2) their expression is arguably proscribed by the challenged statutes, regulations, opinions, and actions of the Registry; and (3) they face a credible threat of enforcement for exercising their constitutional rights. *See Driehaus*, 573 U.S. at 159.

The executive committees have sufficiently demonstrated that they intend to engage in protected speech. Specifically, in their verified complaint, the executive committees declare that

No. 24-5783              *Boone Cnty. Republican Party et al. v. Wallace et al.*              Page 9

they intend to, and have taken steps in furtherance of, printing and distributing communications advocating in favor of Amendment 2.  R. 1 (Ver. Compl. ¶¶ 15–18, 24–25, 31) (Page ID #5–7, 9).

The executive committees have also demonstrated that their conduct is arguably proscribed by the challenged statutes, regulations, opinions, and the actions of the Registry.  Two of the executive committees—HCRP and JCRP—sought an advisory opinion from the Registry as to whether they could expend funds in support of a constitutional amendment.  R. 14-3 (Exhibits to Defs.' Mem. of Law in Resp. to PI Mot.) (Page ID #148–49).  The Registry seems to argue that the advisory opinion issued has no bearing here because the exact details of the executive committees' proposed expenditures were not clearly articulated in their requests.  *See* Defs./Appellees' Response to Pls./Appellants' Emergency Mot. for Inj. Pending Appeal ("Opp'n") at 8.  This argument is unavailing because the Registry addressed the central question still at issue—whether an executive committee may expend funds in support of a constitutional amendment.  And the Registry has not disclaimed this position.  Accordingly, the executive committees have demonstrated that the conduct they intend to engage in—communications advocating in favor of both Republican candidates and a constitutional amendment—is proscribed by Kentucky law.

Although the question is closer, at least one of the executive committees has shown that its speech is presently chilled by a credible threat of enforcement.  To demonstrate a credible threat of enforcement, "the first and most important factor is whether the challenged action chills speech."  *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  The speech of the JCRP has been chilled because, "fearing enforcement action," it will not expend funds in favor of the amendment "without injunctive relief."  R. 1 (Ver. Compl. ¶ 36) (Page ID #10).[3]

When determining whether a petitioner faces a credible threat of enforcement, we have commonly considered four factors:  (1) Have the defendants previously enforced the challenged

---

[3]The speech of HCRP and BCRP may not have been chilled because they "intend[] to make the expenditures in question in favor of the constitutional amendments" regardless of judicial relief.  R. 1 (Ver. Compl. ¶ 36) (Page ID #10); *see* Pls./Appellants' Emergency Mot. for Inj. Pending Appeal at 11 (referencing only the chill to JCRP's speech).  But because "only one plaintiff needs to have standing in order for the suit to move forward," it suffices that JCRP's speech has been chilled.  *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

Case: 3:24-cv-00049-GFVT   Doc #: 29-1   Filed: 09/05/24   Page: 10 of 15 - Page ID#: 311

No. 24-5783            *Boone Cnty. Republican Party et al. v. Wallace et al.*            Page 10

provision against the plaintiffs or others? (2) Have the defendants sent warning letters to the plaintiffs? (3) Do aspects of the regulatory regime make enforcement easier or more likely, such as provision allowing citizens to file complaints? and (4) Have the defendants refused to disavow enforcement of the challenged provision against the plaintiffs? *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

The first factor weighs against the executive committees. They have not supplied any evidence that the challenged restriction has previously been enforced against the plaintiffs or others. The executive committees' generalized contention that the Registry "actively enforces" the state's campaign-finance laws, R. 1 (Ver. Compl. ¶ 7) (Page ID #4), offers little support for the argument that the Registry will enforce here.

We have emphasized, however, that the four factors are "not exhaustive, nor must each be established" as long as "'some combination' of the factors are present." *Online Merchants Guild*, 995 F.3d at 550 (quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)). And here, the remaining factors suggest a credible threat of enforcement in the future. To begin, the Registry has issued an advisory opinion indicating that the precise conduct in which the executive committees seek to engage—expending funds on campaign materials supporting the constitutional amendment—is contrary to Kentucky's laws and regulations. Further, the nature of the challenged regulatory regime makes regulatory investigation and enforcement easier and more likely. Under Kentucky law, members of the public can file a complaint with the Registry, which the executive committees claim is likely. Ky. Rev. Stat. § 121.140(1); *see* R. 1 (Ver. Compl. ¶ 31) (Page ID #9). The allowance of complaints from members of the public creates a "real risk of complaints from, for example, political opponents" with an intent to frustrate speech they oppose. *Driehaus*, 573 U.S. at 164. Such complaints could trigger burdensome investigations and administrative or criminal proceedings against the executive committees in the heat of an election cycle. *See id.* at 165–66; *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). Lastly, the Registry has refused to disavow enforcement of the challenged restrictions. In an email to appellants' counsel, counsel for the Registry declined to "say that the Registry would ignore a properly filed complaint nor guarantee how the Board would vote to handle the matter if

No. 24-5783             *Boone Cnty. Republican Party et al. v. Wallace et al.*             Page 11

it was presented to them." R. 1-4 (Exhibit to Ver. Compl.) (Page ID #24).  Nor has the Registry disavowed its position in briefing.

Mindful that the factors should be viewed holistically, and that we consider only a likelihood of success at this stage, we conclude that the appellants have demonstrated a likelihood that they have standing to seek injunctive relief in this case. Accordingly, we proceed to the merits of the First Amendment challenge.

### IV.

In the realm of First Amendment rights, few are more central than the right to express opinions on electoral questions and the qualifications of political candidates. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298 (1981).  The right to express opinions on such issues is not limited to individuals but inheres also in corporations and other associations. *Citizens United*, 558 U.S. at 342, 346–47 (affording First Amendment protection to corporate expression); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (same as to political parties); *Citizens Against Rent Control*, 454 U.S. at 299 (same as to committees formed to speak on a ballot issue).  Accordingly, it is likely that the executive committees have a right to express themselves on topics related to the election, including advocacy for or against a constitutional amendment.

When analyzing restrictions on expression, we begin by considering whether the restriction burdens speech protected by the First Amendment.  The executive committees' First Amendment rights are likely burdened by the Registry's prohibition on spending in support of a constitutional amendment.  The Registry's interpretation of the state statutes and regulations prohibits the executive committees from expending funds on campaign materials that directly support the passage of Amendment 2.  Because campaign expenditures are a form of political speech, the Registry's limitation on those expenditures likely burdens the executive committees' First Amendment rights. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650–51 (2022); *Kruse v. City of Cincinnati*, 142 F.3d 907, 912–13 (6th Cir. 1998).

No. 24-5783               *Boone Cnty. Republican Party et al. v. Wallace et al.*               Page 12

The Registry seeks to minimize this burden by pointing out that the same members of the executive committees could express their views in another way. *See* Opp'n at 16–17. Namely, they could form—and perhaps have definitionally already formed—a political issues committee, which could raise and expend money in support of the amendment. *See id.* But the availability of an alternative means for members of the executive committees to speak freely does not mitigate the burden placed on the executive committees. The Court rejected a nearly identical argument in *Citizens United*. In that case, the Court reviewed the Federal Election Commission's ban on corporate campaign advocacy in the run-up to an election. 558 U.S. at 337. The Court rejected the argument that a corporation's ability to form and advocate through a federal political action committee ("PAC") nonetheless enabled it to speak. *Id.* Hence, under *Citizens United*, allowing the members of the executive committees to form political issues committees does "not allow [the executive committees] to speak" but rather restricts their speech on the topic of a state constitutional amendment. *Id.*

The Registry does not address this holding of *Citizens United* but instead focuses on distinguishing *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986). Opp'n at 16–17. In that case, the Court analyzed a federal law requiring corporations to establish a "political committee" to make independent expenditures on behalf of candidates. *Massachusetts Citizens for Life*, 479 U.S. at 253. A majority of the Court concluded that heightened regulatory requirements associated with establishing a more formalized organization burdened the non-profit organization's First Amendment activities. *Id.* at 254–56 (plurality opinion), 265–66 (O'Connor, J., concurring).[4] The Registry contends that the apparently lesser burden on the executive committees in forming political issues committees distinguishes this case from *Massachusetts Citizens for Life*. Opp'n at 16. The Registry emphasizes that the executive committees are already "committees" under Kentucky law and may utilize the same officers to operate political issues committees. *Id.* It argues that the

---

[4]Four members of the Court joined in an Opinion that located the constitutional burden in both the heightened organizational requirements, as well as the additional disclosure requirements. *See Massachusetts Citizens for Life*, 479 U.S. at 254–56 (plurality opinion). Justice O'Connor filed a concurring opinion on the narrower ground that the "significant burden" arose "not from the disclosure requirements that [the organization] must satisfy, but from the additional organizational restraints imposed upon it by the" challenged statute. *Id.* at 266 (O'Connor, J., concurring).

additional burdens boil down to (justified) disclosures and the use of a separate bank account. *Id.*

Even assuming that the burdens are relatively less in this case, we cannot find that the executive committees' ability to form political issues committees negates, or renders "negligible," Opp'n at 16, the restriction on executive committees' speech on ballot issues. To begin, the holding of *Citizens United*, which followed *Massachusetts Citizens for Life* by more than two decades, did not rest on the degree of burden imposed by forming a PAC but on the distinction between the two entities. The Court considered the burdens only as an alternative basis for concluding that a corporation's speech was burdened. *Citizens United*, 558 U.S. at 337–38. Further, based on the limited record before us, it does appear that forming a political issues committee would impose some burdens with respect to the time and expense required to establish a new entity at this juncture.

Because the Registry's spending restriction burdens the executive committees' political speech, it is valid only if "justified by a permissible interest." *Cruz*, 142 S. Ct. at 1651–52. Restrictions on campaign speech, including campaign expenditures, are evaluated under strict scrutiny, and only restrictions narrowly tailored to a compelling state interest are valid. *Citizens United*, 558 U.S. at 340; *Kruse*, 142 F.3d at 912–13. By contrast, a mandated campaign disclosure is judged under exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important government interest, and that the disclosure requirement be narrowly tailored to the interest it promotes. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021); *Citizens United*, 558 U.S. at 366–67.

The Registry contends that we should apply only exacting scrutiny here because the restriction is better characterized as a disclosure regulation. Opp'n at 13. The Registry emphasizes the relatively few distinctions between executive committees and political issues committees and the importance of the disclosure regime that applies to the latter but not the former. Both are subject to the general requirements imposed on "committees" under Kentucky law, but as discussed above, a political issues committee intending to raise and spend more than $5,000 must report in the run-up to the election—60 days, 30 days, and 15 days preceding the date of the election. Ky. Rev. Stat. § 121.180(3)(b). By contrast, an executive committee must

report only on an annual or semiannual basis unless they make an independent expenditure expressly advocating the election or defeat of a candidate or slate of candidates. *Id.* §§ 121.120(6)(j), 121.180(2).

We do not think that a ban on speech subject to the creation of a separate political issues committee can be fairly described as a disclosure regulation. Disclosure regulations "may burden the ability to speak," but "do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citation omitted). Here, as discussed, the Registry's requirements prevent the executive committees from speaking on the constitutional amendment. We are not aware of, and the Registry has not pointed us to, any cases construing any similar restriction as simply a matter of disclosure. And both *Citizens United* and *Massachusetts Citizens for Life* treat similar requirements as limitations on speech, not mandated disclosure. *See Citizens United*, 558 U.S. at 337–38; *Massachusetts Citizens for Life*, 479 U.S. at 256–57. True, a political issues committee is required to engage in more frequent and robust disclosure in the run-up to an election than applicable to an executive committee. But that fact alone does not turn a speech limitation into a disclosure requirement.

Because we view the Registry's position as a restriction on campaign expenditures, we apply strict scrutiny. The Registry asserts that the restriction on the executive committees' speech about state constitutional amendments, subject to the formation of a political issues committee, furthers an interest in "disclosure." Opp'n at 14. When reviewing disclosure requirements, the Supreme Court has recognized a "sufficiently important" interest in providing the electorate with information that could enable them to make "informed choices in the political marketplace." *Citizens United*, 558 U.S. at 366–67, 370–71. But the "Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 142 S. Ct. at 1652.

We need not decide whether the interest in an informed citizenry could justify the restrictions here because the restrictions are not narrowly tailored to the interest asserted. When considering whether a regulation or restriction is narrowly tailored to the interest asserted, we consider the availability of less restrictive alternatives. *See Bonta*, 141 S. Ct. at 2386. In this case, the Registry could achieve the same ends—obtaining disclosures in the run-up to an

Case: 3:24-cv-00049-GFVT   Doc #: 29-1   Filed: 09/05/24   Page: 15 of 15 - Page ID#: 316

No. 24-5783         *Boone Cnty. Republican Party et al. v. Wallace et al.*         Page 15

election—by imposing a disclosure requirement on executive committees that raise and expend funds in support of an election.  Indeed, the Registry already orders executive committees to make disclosures within 48 hours of an independent expenditure on behalf of a candidate.  Ky. Rev. Stat. § 121.120(6)(j).  The Registry has provided no explanation why restricting the speech of an executive committee and requiring that it form a separate political issues committee achieves the ends of transparency any more successfully than a standard disclosure requirement.  And, further, the Registry has offered no reason why Kentucky could not enact laws or regulations to require appropriate disclosure from executive committees when they speak on political issues.

*    *    *

Having concluded that the executive committees are likely to succeed on the merits of their First Amendment claim, we need not address the remaining injunction factors.  We pause to note that our resolution of the issues at this stage is only preliminary and fuller consideration is warranted as this case proceeds.  For now, we grant the motion for an injunction pending appeal.

The Registry is enjoined from taking any action to enforce Advisory Opinion 2024-02, including initiating civil proceedings, against the executive committees (HCRP, JCRP, and BCRP) for raising or expending funds in support of a constitutional amendment on the November 2024 ballot.  The Clerk shall set an expedited briefing schedule in the pending appeal of the district court's denial of the executive committees' motion for a preliminary injunction.